**GOODYEAR SYNTHETIC RUBBER CORP., Appellant, v. DEPT. OF INDUS. RELATIONS, and WOLDMAN, Appellees.**

Common Pleas Court, Franklin County.

No. 186631. Decided October 13, 1954.

Vorys, Sater, Seymour & Pease, Columbus, Walter DeBruin, Akron, for appellant.

Hon. C. William O'Neill, Atty. Genl., Franklin A. Kropp, Kiehner Johnson, Asst. Attys. Genl., for appellees.

## OPINION

By HARTER, J.

### ORDER OF DIRECTOR OF INDUSTRIAL RELATIONS—REVERSED AND VACATED UNDER §154-73 GC (§119.12 R. C.)

The Goodyear Synthetic Rubber Corporation of Akron, Ohio, has appealed to this Common Pleas Court from certain "orders" made by the Director of Industrial Relations of the State of Ohio. It is asserted, as to some of those "orders," that the Director was wholly without power to issue them; as to others, that he exceeded his powers; and, finally, that as to certain other "orders," they are not supported by "reliable, substantial and probative evidence" and are not "in accordance with law" as required under §154-73 GC. (Sec. 119.12 R. C.)

In order intelligently to approach a consideration of the legal problems presented by this appeal, there must first be a brief recital of the factual background.

The Goodyear Synthetic Rubber Corporation is wholly owned by the Goodyear Tire and Rubber Company but the plant which it operates in Akron, Ohio, is wholly owned by the Government of the United States, one of twelve such plants in the United States. Goodyear supplies the management and "technical know-how" for this particular government venture and other industrial corporations do the same for other operations in other parts of the country.

The product of this plant is synthetic rubber. This product, as well as the raw materials which go into it, are owned exclusively by the Government of the United States.

The Akron plant was designed and built to process Butadiene and Styrene through co-mirazation in a tank in the presence of a catalyst so as to form the synthetic latex, or artificial rubber. Styrene is a liquid substance with properties not unlike kerosene, or coal oil; with reasonably careful handling (as an intelligent person would handle kerosene) there is no real danger from it.

Butadiene is a heavier-than-air, liquified petroleum gas which boils at 26° Fahrenheit; as it evaporates, it cools itself by a refrigerating process; it is not an "explosive" in the true sense of that term; it will not burn unless it is mixed with oxygen in specific quantities. A match flame or electric spark in a tank of pure butadiene would not ignite this substance; however, in a mixture with oxygen in proper proportions, it could be highly dangerous—having many of the propensities of gasoline.

When this Akron, Ohio, plant was laid out originally and built, those with the "technical know-how" in this field undertook to apply precautions for the handling of the butadiene which would minimize as greatly as possible any danger to human life and any danger of loss

of extremely valuable commodities—i. e. the butadiene itself and the end-result product, synthetic rubber.

In its final analysis, we believe it may be said that the gist of this appeal is found in the basic difference of opinion between the Goodyear experts (and such advisers as they might enlist) on the one hand, and the experts who were advising the Ohio Director of Industrial Relations, on the other hand, as to what is and what is not "safe" in this operation.

A useful purpose might be served if we were to attempt here to recite the various precautions which Goodyear took in providing for ventilation in this plant and a piping system of Schedule 80 steel pipe, numerous relief valves, both manually and automatically controlled, a "tank farm" (the trenches of which were filled with water so as to cover all piping), "fog-nozzle" safety equipment to whirl gases upward and blanket any potential fire with mist, three permanent fire towers at strategic locations, the valves in the various pipe lines being connected permanently to a "burning stack" equipped with a continual pilot flame at a substantial distance from the rest of the plant structures. However, this is a technical field in which this branch of this court has no knowledge and no experience. Such an attempt at recital of these technicalities would no doubt produce errors and perhaps convey an impression not intended by the Court. In any event, we must deal with the "legal" (as contrasted with "technical") phases of this appeal and we believe we can do so on a reasonably intelligent basis with a minimum of references to the technicalities of this process. Accordingly, we will use the foregoing as mere "background" and come directly to the legal phases of this appeal.

Our first inquiry must be directed to the question of whether the Ohio Director of Industrial Relations had the authority to make any of the orders complained of by the appellant.

The Ohio Director of Industrial Relations is a statutory officer, having only such powers as expressly conferred upon him by statute. 32 O. Jur., pages 933 and 934; Mutual Benefit Life Ins. Co. v. Younger (1931) 28 Ohio Nisi Prius Reports (new Series) 368; State v. T. and O. C. Railway Co. (1905) 3 Ohio Nisi Prius Reports (new Series) 234.

With this axiom as our springboard, we look first at the statutes dealing with the powers of the administrative agencies of the State of Ohio. We there find in §154-67 GC (§119.06 R. C.) that it is provided:

"No adjudication of an agency shall be valid unless such agency is specifically authorized by law to make such an order."

A further examination of the Ohio Statutes leads us to the inescapable conclusion that the Director of Industrial Relations is not the state agency which has power over processes involving "liquified petroleum gas" (and butadiene is admittedly such). The Ohio State Fire Marshal has such power exclusively. See §835-4 GC (§3737.18 R. C.).

The Judge writing this opinion, while still a practicing lawyer, actively participated in the drafting of the statutes which gave these powers to the State Fire Marshal and he personally argued in support of such proposed statutes twice before a committee of the Ohio Senate

and once before a committee of the House of Representatives. This Judge has not only, as a lawyer, openly advocated the placing of these responsibilities in the office of the State Fire Marshal, he has also as a judge, zealously guarded and upheld the powers of the State Fire Marshal, in action, under his enabling statutes. See, as an example, the decision in the case of **Tire Industries, Inc. v. State Fire Marshal** (April 9, 1954) Case No. 188,296, Common Pleas Court of Franklin County. It would be grossly inconsistent for this Judge, with such a record, to say now that the Director of Industrial Relations had always had inherent or implied powers over liquified petroleum gases, and the equipment used for storing, handling, transporting and utilizing such liquified petroleum gases, when it is remembered that this Judge was sincerely contending only a few years ago, as an advocate (on behalf of the National Board of Fire Underwriters and its program of fire-safety-engineering) that there was a "blind-spot" in the Ohio statutes in this field which needed a remedy through the enactment of amendments to the Fire Marshal Chapter of the Ohio statutes.

So, we do not wish to fall into the error of such gross inconsistency; rather we are firmly of the opinion that the Ohio Legislature has granted exclusive power to the State Fire Marshal to make rules with respect to the storing, handling, and utilization of these **liquified petroleum gases.** For the Director of Industrial Relations to attempt to promulgate rules in this area would, as we see it, be an illegal invasion of the Fire Marshal's powers and a flaunting of the will of the Legislature, as expressed in §154-67 GC (§119.06 R. C.), and §835-4 GC (§3737.18 R. C.), as above mentioned. This, we feel, we cannot sanction judicially.

Our conclusion in this connection requires that we find certain parts of the order appealed from to be **not** "in accordance with law" (§154-73 GC; §119.12 R. C.) and that a reversal as to such parts of the order is required. Specifically, this finding applies to Items 1 and 2, Items 14, 16, 19, 20, 21 and 22 of the order from which the appeal is taken, since the storing, handling and/or utilizing of liquified petroleum gases is the essence of each and all of the activities there criticized.

We should next appraise, as we see it, Items 9, 10, 11 and 26 of the order from which the appeal is taken. Item 9 deals with the need for constructing an **exhaust** and Item 10 with a device for detecting gas— by audible and visible signals in the Inert Gas Building.

As we interpret the brief filed by appellees' counsel, and as we analyze the Ohio statutes, it must be admitted that there is no specific, statutory provision which mentions "exhausts" or "gas-detection" devices. It is contended, however, that the powers of the Director of Industrial Relations with respect to "ventilation" are broad enough to support orders of the kind here challenged. Reference is specifically made in this connection to the **general** language of §871-15 GC (§4101.11 R. C.) in reciting that an employer "shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes * * * reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters."

This statute must be considered in the light of applicable case law. A succinct statement of that law is to be found in **1 O. Jur. (2d),—Administrative Law and Procedure—Section 55** in the following language:

"While a large measure of discretion may be vested in administrative agencies in the exercise of their powers, this discretion must be lawfully exercised in accordance with established principles of justice. It cannot be exercised arbitrarily, that is, without some fair and substantial cause or reason. It is implied in every law conferring power, and required by due process, that it will be exercised judiciously, with an honest intent to fulfil the purpose of the law. Courts will not substitute their judgment in regard to a matter within the discretion of an administrative agency, but they will see that the discretion is fairly exercised."

Let us inquire whether these "exhaust" and "signal device" orders were actually "judiciously" promulgated "with an honest intent to fulfil the purposes of the law" (quotations are from the foregoing section in **O. Jur.**). We do not wish to substitute our judgment for that of the administrative agency but, on the record here before us, we feel compelled to hold that these two order were, in effect, "unrestrained, arbitrary and discriminatory." Ample safety precautions were, in fact, taken by the appellant upon the advice of the most competent experts in this field; the evidence to the contrary (i. e. as to the inadequacy of the precautions) was, as we see it, unsatisfactory, confused and, indeed, a bit emotional.

On occasions, a legal point can best be made by an analogy which "reduces to the absurd." We believe we can do that here. Natural gas is, as we all know, quite dangerous. If there is any doubt in the minds of anyone, they might well think back to the explosion of the State Office Building here in Columbus in April of 1932 when a natural gas explosion took several lives and caused at least $750,000.00 damage to the State Office Building just as it was being completed for occupancy.

The State Office Building is, or was then located in close proximity to a very large natural gas main carrying gas at high pressures. That main was laid in "filled" ground. The pressure of the "fill" above the gas main apparently caused a separation in a welded seam, gas percolated through the ground (seeking a path of least resistance) into the sub-basement of the office building where it accumulated until it reached a mixture in the proper proportions with air and then was exploded by a spark from an electric drill being used by a workman.

We know in general terms what happened there and there is a possibility that it could happen again. The State Office Building is a "place of employment" for several hundred persons, perhaps thousands. Suppose the Director of Industrial Relations were to order an "exhaust" for each room in the structure and a device giving audible and visual warning of the presence of natural gas in each room for the State Office Building. There might be a need for such exhaust and warning devices if the experience of the past were relied upon; however, such orders would, we believe, be easily and necessarily characterized as "injudicious," "without an honest intent to fulfill the purpose of the law," and "arbi-

trary." Such State Office Building orders, if made, would fall under the language above quoted from O. Jur. and be invalid.

Of course, it would perhaps be possible in the Synthetic Rubber plant here involved to have additional devices incorporated into the manufacturing processes but, to do so would, as we see it, serve no truly useful purpose in the way of making safety more certain than the precautions already being taken. Accordingly, we feel we must discharge our judicial responsibility by holding on the record before us that these two orders, so appealed from, are not "in accordance with law" but are, rather, each invalid.

The 11th item in the challenged order relates to a requirement that, in the inert gas building, proper stairs, properly railed, with adequate lighting therefor, should be provided to lead to the basement of the gas reduction (or "inert gas") building. That basement houses the brine compressor pumps. The pumps do not require daily attention but, quite obviously, they probably do require some periodic servicing and attention because anything mechanical requires such servicing.

Counsel for the appellee directs attention to §1028-1 GC (§4107.27 R. C.) as the basis for this order. That statute does require that stairways shall be provided for each "floor or basement of each section" of a building "in which a shop or factory is operated, excepting only rooms on such floors or basements used only for storage purposes * * *."

There is very little evidence regarding this particular problem in this record—i. e. whether that basement or building was used and what for. We sincerely believe that the evidence is so meager that no intelligent decision can be made on it—i. e. as to whether or not the order that a stairway be constructed was supported by reliable, substantial, probative evidence (as required by §154-73 GC). Whichever side had the "burden of proof" on this issue should, therefore, fail on this point.

Because we sincerely entertain this view regarding this evidence, we must inquire as to who did have the burden of proof in the Administrative Agency hearing and who should fail if such burden of proof was not met. A consideration of this procedural problem brings us to a consideration of a significant and relatively novel development at the Akron hearings on this matter.

While it is a bit difficult to ascertain by examining the transcript of the Akron proceedings just what "theory" was being followed as to procedure by the Director of Industrial Relations then, it would appear that the Factory Division of the Ohio Department of Industrial Relations had theretofore promulgated and addressed a 44 item order to the Goodyear Synthetic Rubber Corporation and the latter corporation had demanded a hearing thereon. Such procedure, demanding a hearing, was expressly authorized by §§154-62 to 154-74 GC, as a statutory prerequisite to a valid "adjudication" hearing. The parties assembled to Akron with the Ohio Director of Industrial Relations personally present and presiding. He announced, then, that the purpose of the hearing was to permit the Goodyear Synthetic Rubber Corporation to "show cause why §154-45 GC should not be enforced against it" (Record page 5). The Director declined to put on witnesses in support of the order which had

theretofore been issued by the Division of Factories in his department (Record pages 9 and 16) and directed, rather, that Goodyear Synthetic Rubber Corporation put on its witnesses (Record pages 24 and 26).

Counsel for the Director in this court contends that "it is not important nor material whether the hearing before the Director was 'on appeal' or an original proceeding" and that "Goodyear had its hearing. It knew of the charges sufficiently to put on its case. * * * Just because Goodyear was asked to go first and put on its case does not violate due process."

This contention is only partially sound, as we see it; we believe that "due process" requires something more than was afforded by the Director at the Akron "adjudication hearing." We admit that there seems to be no direct decision by an Ohio court as to just who has the "burden of proof" in these "adjudication hearings" but we firmly believe that it is implicit in the whole Administrative Procedure Act that a party asserting the affirmative of an issue bears the burden of proof here, as in all fields of American Jurisprudence. Our conclusion on this point is fortified by the language contained in **1 O. Jur. (2d)—Administrative Law and Procedure—Section 103.**

It was clearly the Department of Industrial Relations (not Goodyear Synthetic Rubber Corporation) which was asserting the "affirmative, i. e. saying its orders requiring changes and adoption of new techniques and construction were necessary and required for "safety." With such "affirmative" of the issue, went the right to "open and close" with evidence and argument. Anyone seeking to change the **status quo** should have such right. There was, as we see it, a fundamental infraction of law when this practice was not followed at the Akkron hearings.

But let us pursue this inquiry as to "burden of proof" and "opening and closing" further. The Director of Industrial Relations might well have said at the start of the Akron hearing "I have a known right to 'open and close' in this hearing which I voluntarily elect to waive." (Parenthetically, it is appropriate for us to observe that in nearly all fields of the law, recognition is given to the. doctrine of "waiver" as a **voluntary relinquishment** of a known right.)

Had the Director made such a statement, the Goodyear Synthetic Rubber Corporation would have had a correlative right **not** to offer **any** evidence—to "rest" their case. The record then would have contained no evidence when it reached this Court on appeal. Our Court would then have been confronted with the provisions of one paragraph of **§154-73 GC (§119.12 R. C.),** as follows:

"The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is **supported** by reliable, probative, and substantial evidence and is in accordance with law. **In the absence of such a finding,** it may reverse, **vacate,** or modify the order or make such other ruling as is **supported by** reliable, probative, and substantial evidence and is in accordance with law. * * *."
**(Emphasis added.)**

We direct attention to the significant requirement in this quoted language that the existence in the record of "reliable, probative and substantial evidence" is a prime requisite to any ruling by the court to which the appeal is taken. With no evidence to support the order appealed from, vacation of the order would undoubtedly be mandatory. This approach to the "order of proof" and "burden of proof" problems serves, as we see it, to point-up most graphically the denial of "due process of law" to Goodyear Synthetic Rubber Corporation on what we regard as a most significant procedural matter.

This part of this opinion would be incomplete if we were not to comment upon the legal device which the Director attempted to invoke at the start of the Akron hearings to shift the burden of "going forward" from his Department (or the subordinate Division of Factories) to Goodyear Synthetic Rubber Corporation—namely, the order that Goodyear Synthetic Rubber Corporation "show cause" why an order should not be made against that corporation. This "show cause" device is creeping into our American jurisprudence more and more in recent years. It is a favorite device in certain fields of Federal legislation; the Securities Exchange Act, and the Pure Food and Drug Acts are, we believe, examples of this device. However, we believe that, in each instance where the "show cause" device is used, an express statutory enactment is necessary to justify it because its basic theory is inimical to the "fair play" doctrine so thoroughly imbedded in American and English law to the effect that no one shall ever be required to prove his innocence; rather, the burden of proving guilt, or wrongdoing, is always upon the party making such accusation.

This fundamental proposition has found express statutory recognition in the Federal Administrative Procedure Act, 5 U. S. C. A. 1001, Section 7 (c): "except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. * * *"

This axiom of American Jurisprudence, to the effect that "the burden of proof lies upon him who affirms, not him who denies" was considered in only one case which we have been able to find in an "adjudication" hearing before an administrative agency. The problem was squarely presented in the case of Philadelphia Company v. Securities and Exchange Commission (1949—C. of A.—Dist. of Col.) 175 Fed. (2d) 808. We will not here attempt to recite the relatively complicated fact pattern which was presented there; rather, we will quote certain passages from the opinion which are generally applicable to our problem: Opinion Page 818 of 175 Fed. (2d):

"The Commission permitted only the submission of data, views and comments and the making of oral argument. It failed, so far as is shown by the record certified to this court, * * * to apprize Philadelphia of the facts upon which its proposed action, amending" (its Rule) "* * * was to be taken (thereby making futile Philadelphia's offer of proof); and it failed to introduce or receive evidence, to hear witnesses, to permit cross-examination, and to make a proper transcript of record. Accordingly, its 'hearing' did not satisfy the requirements, for adjudicatory action, of either the due process clause, the Holding Company Act, or

the Commission's own rule. The Commission erroneously failed to assume the burden of proof in respect of the propriety of its proposed action. * * * With some exceptions not here pertinent the burden of proof lies upon him who affirms, not him who denies. 1 Jones, Evidence in Civil Cases (4th Ed. 1938) Sec. 180; Stephen, Digest of the Law of Evidence (12th Ed. 1946) Article 100. On the contrary of assuming the burden of proof the Commission, as appears from the statement of facts at the outset of this opinion, required Philadelphia to attempt to persuade it that the exemption afforded Pittsburgh by Rule U-49 (c) should not be revoked. We hold accordingly that the Commission's order was invalid for lack of a proper hearing. * * *"

We believe the reasoning of that federal court is extremely persuasive. It was developed without reference to Section 7 of the Federal Administrative Procedure Act, above referred to, because that Section of the Act had not yet been enacted. See footnote explanation, page 818 of 175 Fed. (2d) 808.

This is not the time, or a suitable occasion, to consider the history or reasons for the distinction between common law and "civil" law requirements of the continental European countries on this problem of burden of proof. Suffice it to say that in the European countries, which operate under the theory that the burden of proving innocence, notably France, justice seems to be expeditiously administered but it is not done our way. We conceive it to be our clear duty to preserve the American tradition of proving "guilt" or "wrongdoing" or "an affirmative" by placing the burden thereof squarely upon the accuser and allowing it to remain there through all stages of any "adjudication" hearing, either before an administrative agency, or a court, unless there is clear legislation (which is constitutionally valid) which indicates a contrary rule. There is no such exempting legislation in our present case.

Accordingly, as to this problem of the order requiring stairs into the brine-compressor basement of the inert gas building, we hold that there is no such reliable, probative and substantial evidence as supports the order made thereon, and that the order made thereon is not "in accordance with law" because "due process of law" was not afforded the Goodyear Synthetic Rubber Corporation in the adjudication hearing of the Department of Industrial Relations. Under §154-73 GC (§119.12 R. C.) a vacation of that part of the order appealed from is therefore demanded, as we see it.

Only one other item of the Department's order is actually pressed for review by this Court on this appeal. That item bears number 26 and deals with the problem of limiting smoking—i. e. the providing of safe places for the workmen to smoke. Such order is justified and proper, according to the contention advanced by the Attorney General in support of the position of the Director of Industrial Relations, under §§871-15 and 871-16 GC (§§4101.11 and 4101.12 R. C.). It is argued that, "if the employer is required to provide a safe place to work, it isn't very difficult to provide a safe place to smoke."

If this item were the only item of the order challenged, and if the Director of Industrial Relations had given Goodyear Synthetic

Rubber Corporation a proper, "due process of law" adjudication hearing, we believe we could have honestly affirmed this item of the order under the provisions of §154-73 GC. (Sec. 119.12 R. C.) However, the deprivation of a "due process of law" hearing at Akron (on this, as well as the several other items of the order, and as explained at substantial length heretofore in this opinion) requires that we find that this 26th item of the order is **not** "in accordance with law" and is **not** supported by "probative" (meaning thereby "legally admitted" and "legally competent") evidence. We hold therefore that we must vacate this 26th item of the order under the mandate of §154-73 GC (§119.12 R. C.).

The appellee may of course have exceptions to the findings and rulings herein contained.